IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL CLARK,

    Plaintiff,                     No. CIV S-02-2689 FCD GGH P

    vs.

L. WARREN, et al.,

    Defendants.               FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court are cross-motions for summary judgment filed by defendants on February 16, 2006, and plaintiff on March 28, 2006. After carefully reviewing the record, the court recommends that defendants' motion be granted and plaintiff's motion be denied.

        The defendants in this action are L. Warren, Max Elorza, Williams, M. Driggers, P. Enriquez, L. Rianda and E. Alameida. Plaintiff alleges that defendants Warren, Williams, Elorza, and Driggers retaliated against plaintiff for his complaints against prison staff by removing him from the vocations waiting list and reducing his work/privilege status from A1-A to A2-B. Plaintiff also alleges state law claims against all defendants.

1

II. <u>Summary Judgment Standards Under Rule 56</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See <u>id.</u> at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

1 On February 19, 2003, the court advised plaintiff of the requirements for opposing
2 a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154
3 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.
4 1988).

III. Undisputed Facts

Inmates in full time work/training assignments are assigned to work group A-1. Cal. Code Regs. tit. 15, § 3044(a)(2). Inmates in work group A-1 are eligible for Privilege Group A. Id., § 3044(d). Inmates who are willing but unable to perform in a full time assignment are in Work Group A-2. Id., § 3044(a)(3). Inmates in Work Group A-2 receive half-time credit, i.e. one day credit for each two days worked. Id. Inmates in Work Group A-2 are eligible for Privilege Group B. Id., § 3044(e).

Inmates in Privilege Group A receive the following privileges: 1) family visits limited only by the institution, etc.; 2) visits during non-work/training hours limited only by availability of space, etc.; 3) maximum canteen draw; 4) telephone access during nonworking/training hours; 5) access to yard, recreation and entertainment activities during non-working training hours; 6) excused time off; 7) the receipt of four personal property packages. Cal. Code Regs. tit. 15, § 3044(d)(3).

Inmates assigned to Privilege Group B have the same privileges as inmates in privilege group A but for the following differences: 1) one family visit every six months; 2) one-half the maximum monthly canteen draw; and 3) one personal telephone access period per month. Cal. Code Regs. tit. 15, § 3044(e)(2).

In 1988 and 1989 plaintiff cooperated with officials of the California Department of Corrections and Rehabilitation (CDCR) regarding the activities of prison gangs. Plaintiff participated in a video demonstrating how prisoners made and concealed weapons. On March 29, 2000, plaintiff was transferred to Mule Creek State Prison (MCSP).

/////

At some point following plaintiff's transfer to MCSP, various prison staff disclosed plaintiff's status as a "snitch" to other inmates. The parties do not dispute that the disclosure of an inmate as "snitch" can create serious security concerns for the inmate. At some time prior to January 8, 2002, plaintiff complained to defendant Elorza regarding these disclosures.

Plaintiff's first job assignment at MCSP was as a clinic porter which he acquired in May 2000 and held until February 2001. At a Unit Classification Committee (UCC) hearing on February 27, 2001, plaintiff asked to be removed from his assignment as a clinic porter and be placed on the pre-vocational waiting list during which time his work privilege group was A2-B. On June 28, 2001, plaintiff was placed in the pre-vocational program and reassigned to work/privilege group A1-A.

On August 21, 2001, the UCC consisting of defendants Warren, Elorza, Williams and Driggers removed plaintiff from the pre-vocational program, placed him on a waiting list in a vocational program and continued plaintiff's work/privilege A1-A status.

On January 1, 2002, plaintiff received a ducat to report to the vocational welding assignment and notified defendant Elorza. On January 8, 2002, plaintiff appeared before the UCC consisting of defendants Warren, Elorza, Williams and Driggers to address plaintiff's placement in the vocational welding assignment. At the hearing, plaintiff told the committee that he did not feel safe about being placed in the vocational welding assignment. Plaintiff refused to report to his welding assignment. The committee then placed plaintiff on work/privilege A2-B status.

On January 17, 2002, plaintiff filed an inmate appeal challenging the January 8, 2002, UCC decision to reduce his work/privilege status to A2-B. On May 22, 2002, plaintiff's appeal was partially granted at the second level of review in that a modification order was issued for an Institutional Classification Committee (ICC) program review. On June 28, 2002, the second level appeal was affirmed at the Director's Level.

On July 19, 2002, the ICC convened to review plaintiff's case due to the appeal modification order. The ICC granted plaintiff work/privilege A1-A status effective January 8, 2002.

IV. Discussion

    A. Retaliation

Plaintiff argues that defendants removed him from his A1-A status following the January 8, 2002, hearing because he complained about prison staff disclosing his status as a "snitch." Plaintiff's theory appears to be that defendant Elorza, with whom plaintiff had earlier discussed this matter, told the rest of the committee about their discussions prior to the hearing.[1]

Defendants move for summary judgment on the merits and based on qualified immunity.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, [footnote 5], and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

In Rhodes v. Robinson, the Ninth Circuit also indicated that an allegation of harm could be sufficient if the inmate could not allege a chilling effect:

> If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. Alleging harm and alleging the chilling effect would seem under the circumstances to be no more than a nicety. See, e.g., Pratt, 65 F.3d at 807 (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing

---

[1] In claim five, plaintiff also alleges that defendants violated his First Amendment rights when they removed him from the vocations waiting list and reduced his status to A2-B. This claim is really a restatement of plaintiff's retaliation claim.

1  whether the harm had a chilling effect); Valandingham v.
2  Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989)(same).

3  408 F.3d at 568 n. 11.

4        Defendants concede that plaintiff's complaints regarding prison staff would be
5  protected speech.  See Geder v. Godinez, 875 F. Supp. 1334 (N.D. Ill. 1995).  Defendants argue
6  that they removed plaintiff from his A1-A status not because he complained about prison staff
7  but because he did not adequately explain his safety concerns in the vocational welding
8  assignment.  Defendants argue that plaintiff's failure to explain his safety concerns is not
9  protected speech.

10        Plaintiff claims, and defendants do not clearly dispute, that at the hearing
11  defendants had some knowledge of plaintiff's safety concerns based on the staff disclosures.  As
12  discussed above, it is undisputed that plaintiff had discussed this matter with defendant Elorza
13  prior to the hearing.  The parties do not dispute that defendant Elorza opened the hearing by
14  stating that plaintiff had security concerns regarding his placement in welding program.
15  Defendants' Statement of Undisputed Facts filed February 16, 2006, ¶ 37; Plaintiff's Statement
16  of Undisputed Facts filed March 28, 2006, ¶ 37.  Plaintiff claims, and defendants do not dispute,
17  that information regarding the disclosures was in his C file.  It is not unreasonable to infer that
18  defendants, as members of the UCC, had either reviewed plaintiff's C-file or else had it before
19  them at the hearing.

20        It is undisputed that plaintiff generally expressed security concerns at the January
21  8, 2002, hearing based on the staff disclosures.  It is also undisputed that the inmates with whom
22  plaintiff would work at the welding assignment were inmates with whom plaintiff would interact
23  with in his housing unit, the dining hall and yard.  It is also clear from the record that plaintiff's
24  security concerns extended only to his placement in the welding assignment.  In other words,
25  plaintiff did not claim that, for example, he should have been moved to safer housing.  It is also
26  \\\\\

clear that plaintiff did not explain to defendants why his security concerns applied only to his job assignment.

While plaintiff claims that defendants removed him from A1-A status because he complained about the conduct of other prison officials, he has offered no evidence from which such an inference can be drawn. Instead, the evidence supports defendants' claim that they removed plaintiff from his A1-A status after determining that his security concerns were not legitimate because they did not extend to his housing assignment, the dining hall or the yard. In other words, if plaintiff had legitimate safety concerns regarding his job assignment based on the staff disclosures, he would have also been concerned about his housing assignment, the dining hall and yard. For these reasons, the court finds that defendants' decision to reduce plaintiff's status to A2-B was based on plaintiff's failure to adequately support his security concerns. Defendants did not retaliate against plaintiff based on protected conduct.

In a declaration submitted in support of his opposition, plaintiff now claims that while he had security concerns regarding the inmates in his housing unit, the dining hall and yard, he avoided them by not going to the dining hall or the yard. Had plaintiff communicated this to defendants at the hearing, the court would not find that defendants were required to defer to plaintiff's judgment regarding how to best handle his security issues. Moreover, if plaintiff's safety concerns were so great that they required him to avoid the yard and the dining hall, then defendants may have been legally obligated to place him in more safe housing, such as ad seg. Plaintiff's declaration is not persuasive.

Although the record does not reflect why plaintiff's A1-A status was retroactively restored by the ICC on July 19, 2002, the court finds that this issue is not material because defendants had legitimate reasons for removing plaintiff's A1-A status. For these reasons, the court does not find that defendants removed plaintiff's A1-A status based on his protected conduct.

/////

The court also finds that defendants are entitled to summary judgment because plaintiff has not demonstrated sufficient harm as a result of the alleged retaliation. As discussed above, plaintiff must demonstrate either a chilling of his First Amendment rights as a result of defendants' conduct or else a more than "minimal" injury.

As to chilling effect, at his deposition, plaintiff testified that he was scared to file administrative appeals after the January 8, 2002 hearing, because he thought he would again be retaliated against for complaining about prison staff. Plaintiff's Deposition, p. 221. However, plaintiff also testified that he filed three or four civil actions in state court against CDCR officials following January 8, 2002. Id., pp. 224-225. Plaintiff also testified that he filed approximately six tort claims against CDCR employees with the Victims Compensation and Government Board after the January 8, 2002, hearing. Id., pp. 226-228. Plaintiff also filed the administrative appeal following the January 8, 2002, hearing which led to the retroactive reinstatement of his A1-A status. Plaintiff also filed the instant action challenging the January 8, 2002, hearing.

Based on the evidence discussed above, the court does not find that plaintiff's First Amendment rights were chilled as a result of the January 8, 2002, hearing. Plaintiff's filings following the January 8, 2002, hearing undercut his claim that he was afraid of further retaliation.

The court also finds that any injury plaintiff suffered as a result of the alleged retaliation was minimal. As discussed above, as of July 19, 2002, plaintiff's A1-A status was retroactively restored to January 8, 2002. Therefore, any time credits plaintiff lost as a result of the status change were restored. The only other injuries suffered by plaintiff during the 6 months he was on A2-B status were that he was allowed fewer family visits, one-half the maximum monthly canteen draw, and one personal telephone access period per month as opposed to phone access during nonworking/training hours.

The differences described above between privilege groups A and B are minor. Any injury suffered by plaintiff as a result of his brief placement in Privilege Group B were

minimal. Plaintiff was not, for example, transferred to a different prison. Because defendants caused plaintiff to be subject to these minor changes in conditions for only six months, the court finds that plaintiff suffered only minimal injury during his brief A2-B status.

Finally, the court observes that plaintiff may be arguing that defendant Warren retaliated against him by threatening to place him in ad seg during the January 8, 2002, hearing. Threats alone, absent a chilling effect, do not state a retaliation claim. Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).

For the reasons discussed above, the court recommends that defendants' summary judgment motion be granted as to plaintiff's retaliation claim. Plaintiff's cross-motion should be denied. Defendants also argue that they are entitled to qualified immunity as to this claim. Because the court finds that defendants are entitled to summary judgment on the merits, it need not reach the issue of qualified immunity.

B. State Law Claims

Plaintiff alleges state law claims against all defendants. Because the court recommends dismissal of plaintiff's remaining federal constitutional claim, the state law claims should be dismissed. 28 U.S.C. § 1367(c) (court may decline to exercise jurisdiction against state law claims if the claims over which the court had original jurisdiction are dismissed).

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's summary judgment motion filed March 28, 2006, be denied;

2. Defendants' summary judgment motion filed February 16, 2006, be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   6/29/06

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
cl2689.sj